**Anne E. SPENCER, Plaintiff,**

v.

**GENERAL ELECTRIC CO. and James Russell Neal, Defendants.**

**Civ. A. No. 87–1214–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Jan. 17, 1989.

Paul C. Sprenger, Paul C. Sprenger & Associates, Jane Lang McGrew, Weissbrodt, Swiss & McGrew, F. Joseph Nealon, Amy S. Owen, Miles & Stockbridge, Washington, D.C., for plaintiff.

Peter G. Nash, Frances C. Moran, Ogletree, Deakins, Nash, Smoak & Stewart, Washington, D.C., C. Richard Miserendino, Fairfax, Va., Bernard J. DiMuro, Hirschkop, DiMuro & Mook, Alexandria, Va., for defendants.

## ORDER

ELLIS, District Judge.

This matter is before the Court on plaintiff's motion to amend this Court's judgment of October 6, 1988.[1] Specifically, plaintiff seeks permanent injunctive relief compelling defendant General Electric (GE) to "issue, disseminate and implement a comprehensive anti-sexual harassment poli-cy."[2] By Order dated November 1, 1988, this Court, *inter alia*, denied plaintiff's motion to amend the judgment and grant plaintiff's proposed permanent injunctive relief. The Court took under advisement, however, whether to order some form of injunctive relief short of plaintiff's proposal.[3] The Court did so because plaintiff raised substantial questions concerning the effectiveness of GE's remedial steps. Accordingly, GE was ordered to submit additional materials regarding its sexual harassment policy, and plaintiff was granted leave to file an additional brief. Both parties submitted additional briefs and materials. Based on counsels' oral arguments and review of the briefs and supporting materials, the Court concludes that a permanent injunction is unnecessary. GE has remedied the sexual harassment which triggered Title VII liability and has acted effectively to prevent future illegal conduct by the adoption of a comprehensive anti-sexual harassment policy. Accordingly, plaintiff's motion is hereby DENIED.

Where, as here, a violation of Title VII is found, a court has the power, and indeed the obligation,[4] to award any equitable

1. Plaintiff's motion was timely filed pursuant to Rule 59(e), Fed.R.Civ.P. Also pending before this Court is plaintiff's motion for the award of attorney's fees. Resolution of this motion, the last matter in this case before the Court, is forthcoming.

2. The October 6 judgment found defendant GE liable for maintaining a sexually hostile work environment and awarded plaintiff nominal damages. The Court, however, found injunctive relief inappropriate for two reasons: (1) the employee primarily responsible for creating the hostile environment was no longer in defendant's employ, and (2) defendant has already instituted a comprehensive anti-sexual harassment policy. *See Spencer v. General Elec. Co.,* 697 F.Supp. 204, 219 (E.D.Va.1988).

3. *See also Spencer v. General Elec. Co.,* No. 87–1214–A (E.D.Va. Dec. 1, 1988) (Order confirming that plaintiff's motions for injunctive relief and attorney's fees were taken under advisement).

4. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) ("Where racial discrimination is concerned, 'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discrimina-tory effects of the past as well as bar like discrimination in the future.'") [quoting *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965)]. In *NAACP v. City of Evergreen,* 693 F.2d 1367 (11th Cir.1982), for example, the district court found a long history of racially discriminatory hiring practices, but denied injunctive relief because of the city's new non-discrimination policy. *Id.* at 1370. The Eleventh Circuit reversed and ordered permanent injunctive relief, noting the courts' affirmative duty "to correct and eliminate the present effects of past discrimination." *Id.* at 1370–71. In such cases where there is "abundant evidence of consistent past discrimination," the *Evergreen* court noted, "injunctive relief is *mandatory* absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law." *Id.* at 1370 (emphasis in original). But unlike *Evergreen,* there is no evidence here of consistent, widespread past discrimination. Rather, the instant illegal conduct was precipitated by a single individual within a relatively small and isolated working group. This is not the *Evergreen* pattern of discrimination. Nor is there any evidence of lingering effects of the kind that flowed from the long-term, systematic discrimination found in *Evergreen.* Absent such evidence, injunctive relief is not mandatory. *See Johnson v. Brock,*

remedies *necessary* "to advance the dual statutory goals of eliminating the effects of past discrimination and preventing future discrimination." *Pitre v. Western Elec. Co., Inc.*, 843 F.2d 1262, 1274 (10th Cir.1988) [citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975)]. In the case at bar, specific actions have already been taken to alleviate the effects of the past harassment. Plaintiff was, at her request, promptly transferred to a similar position in a different GE office at the same pay level and with similar opportunities for advancement. *Spencer*, 697 F.Supp. at 215. Neal, the harassing employee, was demoted by GE and later terminated. *Id.* at 216. And the Court awarded plaintiff nominal damages for her success in proving that GE maintained a hostile work environment.[5] *Id.* Those actions remedied, to the extent legally practicable, the effects of the proven sexual harassment.

■■■■ The second goal of Title VII, preventing future illegal discrimination, is the crux of the instant motion. Injunctive relief is uniquely designed to prevent illegal conduct.[6] Such relief, however, is not mandatory in all Title VII cases.[7] Only where there are lingering effects or a not insubstantial risk of recurring violations is such relief necessary. At the same time, injunctive relief is not automatically precluded simply because the offending party has ceased the illegal conduct,[8] demonstrated its good faith intent to comply with the law, or even implemented an affirmative plan to remedy past discrimination.[9] Rather, the court must carefully examine the circumstances of each case, taking into account "the bona fides of [defendant's] expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *United States v. W.T. Grant*, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). Before granting injunctive relief, the court must then conclude that a "cognizable danger of recurrent violation" exists.[10] *Unit-*

810 F.2d 219, 225 (D.C.Cir.1987) (injunctive relief not mandatory under Title VII, but determined on particular facts of each case).

5. No monetary relief apart from nominal damages was awarded because plaintiff "has not demonstrated that she suffered any tangible loss as a result of Neal's conduct." *Spencer*, 697 F.Supp. at 219. Plaintiff's claims that she had lost overtime hours and promotional opportunities as a result of the transfer were not substantiated. *Id.*

6. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953); *United States v. Hunter*, 459 F.2d 205, 219 (4th Cir.), *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972).

7. *See supra* note 4 and *infra* note 9.

8. *See Allee v. Medrano*, 416 U.S. 802, 810–11, 94 S.Ct. 2191, 2197–98, 40 L.Ed.2d 566 (1974); *cf. United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) ("court's power to grant injunctive relief survives discontinuance of the illegal conduct").

9. In *United States v. County of Fairfax*, 629 F.2d 932 (4th Cir.1980), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981), for example, the Fourth Circuit reversed the district court's denial of injunctive relief after finding racially discriminatory employment practices.

In that case, the county had recently adopted an affirmative action plan. Even so, the Fourth Circuit explained, a court is "under a duty to render a decree which will both eliminate past discrimination and bar discrimination in the future." *Id.* at 941 [citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975)]. It may not simply "'abdicate to defendants' good faith its duty of insuring removal of all vestiges of discrimination.'" *Id.* at 941–42 [quoting *Barnett v. W.T. Grant Co.*, 518 F.2d 543, 550 (4th Cir.1975)]. The case at bar is distinguishable from *County of Fairfax*. Here, there was no evidence of a systematic pattern of harassment or continuing effects of past harassing conduct. Rather, plaintiff proved a series of harassing incidents caused by one individual in one isolated part of the company. Unlike the facts present in *County of Fairfax*, there is no evidence here of any widespread misconduct or lingering effects. *See also supra* note 4.

10. Plaintiff relies on *W.T. Grant Co.* for the proposition that defendant bears a heavy burden to defeat injunctive relief by demonstrating "there is no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. at 897. That reliance, however, is misplaced and the quotation taken out of context. In *W.T. Grant Co.*, the Supreme Court did place a heavy burden on defendant, but only to prove that an antitrust case was mooted by the cessation of the alleged illegal activity, thereby depriving the court of

*ed States v. Hunter*, 459 F.2d 205, 210 (4th Cir.1972) [citing *United States v. W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. at 898]. Here, the Court is satisfied GE has, in good faith, taken sufficient action to prevent future illegal harassing behavior and to ensure that any alleged harassment is promptly investigated and, if found to exist, halted and punished. There is no "cognizable danger of recurrent violation," and injunctive relief, therefore, is unwarranted.

■ Plaintiff's motion for injunctive relief is predicated on her position that GE's remedial actions—that is, the termination of Neal, the offending employee, and the implementation of a sexual harassment policy—are simply too little, too late. She first contends that the termination of Neal is irrelevant to the present need for injunctive relief. GE's Title VII liability, plaintiff correctly points out, was also grounded in its own management failures which allowed the creation and maintenance of a hostile work environment. The potential for future discriminatory or harassing conduct may remain in the absence of other corrective measures by GE. Plaintiff's point is well-taken. Neal's termination is not dispositive. It is nonetheless relevant; it weighs against the necessity for injunctive relief where, as here, there is no evidence that the illegal conduct was widespread—that employees elsewhere in the

company were involved.[11] It also reflects well on GE's *bona fides* in addressing the issue.

■ Even so, plaintiff questions GE's good faith in implementing its sexual harassment policy. Specifically, plaintiff claims that GE's policy was issued on the eve of trial and, therefore, constituted little more than last-minute posturing. If this were the case, it might well undermine confidence in GE's good faith commitment to eradicate illegal harassing conduct.[12] The facts, however, do not show this. Instead, the record reflects that GE's new sexual harassment policy is not its first attempt to address this serious problem. *See Spencer*, 697 F.Supp. at 216. Indeed, even before plaintiff began her employment with GE in 1983, the GE employee handbook included some form of a sexual harassment policy. Since 1986, the new employee orientation program has specifically included information regarding that policy. The latest version of GE's policy, issued in draft form in May, 1988, represented the culmination of a year-long in-house review process. That process began in early 1987, triggered by internal GE recommendations that GE issue a policy document on sexual harassment. By May 1987, prior to the filing of plaintiff's complaint, a draft policy had been prepared.

jurisdiction. Here, the issue is not subject matter jurisdiction, but rather the appropriate remedy after a finding of liability. *Id.* Once Title VII liability has been established, it is reasonable to shift to defendant the burden to come forward with evidence of remedial measures, as well as evidence to show that the violations will not recur. After all, defendant is in the best position to provide such evidence. The ultimate burden of persuasion may equally reasonably remain with plaintiff. In any event, the precise locus and nature of the burden of persuasion on this issue is immaterial here; the Court finds that the evidence in support of denying injunctive relief is clear and convincing.

**11.** *See EEOC v. Domino's Pizza, Inc.*, 34 Fair Empl.Prac.Cas. (BNA) 1075, 1077 (E.D.Mich. 1983) [1983 WL 477]; *McMullen v. Warner*, 416 F.Supp. 1163 (D.D.C.1976); *cf. Bundy v. Jackson*, 641 F.2d 934, 946 n. 13 (D.C.Cir.1981) (finding no certainty that harassment would not recur, in part because "all the harassing employees still work for the agency"). Plaintiff cites an-

other sexual harassment suit against GE in 1983 as evidence that GE has failed, even when notified of a problem, to correct the management procedure and attitude that allegedly tolerates such hostile work environments. *See Vegh v. General Elec. Co.*, 34 Fair Empl.Prac.Cas. (BNA) 135 (E.D.Pa.1983). That case, plaintiff admits, was apparently settled and did not result in a finding of liability. It, therefore, is not probative or persuasive evidence of the existence of a systematic pattern of sexual harassment at GE.

**12.** *See Cypress v. Newport News General and Nonsectarian Hospital Ass'n*, 375 F.2d 648, 658 (4th Cir.1967) (In racial discrimination suit against a hospital, the Fourth Circuit noted that "'protestations of repentance and reform timed to anticipate or to blunt the force of a lawsuit offer insufficient assurance' that the practice sought to be enjoined will not be repeated.") [quoting *Lankford v. Gelston*, 364 F.2d 197, 203 (4th Cir.1966) ]; *accord James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 354–55 (5th Cir.1977) (quoting *Cypress* in Title VII action),

This draft was submitted to the U.S. Equal Employment Opportunity Commission in response to plaintiff's complaints. Plaintiff, therefore, was fully aware of GE's efforts to revise its policy long before the issuance of the May, 1988 draft. In short, GE's draft, contrary to plaintiff's allegations, was not a last-minute pre-trial ploy. Instead, the record reflects GE's ongoing efforts to implement, review, and strengthen its sexual harassment policy. This demonstrates a genuine, not transitory, commitment to banning sexual harassment in the workplace.

■■■ Plaintiff further argues that GE's policy is neither comprehensive nor sufficiently detailed to preclude injunctive relief.[13] Plaintiff's concerns are, in essence, the following: First, plaintiff contends that the policy is directed only to managerial, and not to all, employees. Second, plaintiff alleges that GE's policy has no specific complaint procedure. While conceding that the policy mentions that Employee Relations Representatives process complaints, she complains that specific process steps are not explained nor is confidentiality ex-

pressly guaranteed. Third, she complains the policy does not explicitly prohibit retaliation by GE against any employee complaining of sexual harassment.[14] And finally, she asserts that GE's policy fails to require proper training for GE managers and employees.[15]

■ GE's detailed responses to each of plaintiff's charges ultimately persuade the Court that the scope and detail of GE's sexual harassment policy render injunctive relief unnecessary. GE has already essentially complied with plaintiff's demands. Moreover, GE's policy is neither inadequate in scope or detail. First, contrary to plaintiff's claims, the policy is explicitly directed to all employees, not just management. Article I of GE's Military and Data Systems Operations[16] Policy/Instruction 7.34 on Sexual Harassment (hereinafter M & DSO Policy), issued May, 1988, explicitly states, in pertinent part:

It is imperative that *managers and employees* at all M & DSO locations comply with both the spirit and intent of federal, state, and local laws, government regulations, executive orders and, where appli-

*cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).

13. Specifically, plaintiff alleges that defendant GE's policy does not satisfy the standards for an anti-sexual harassment policy set forth in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72–73, 106 S.Ct. 2399, 2408–09, 91 L.Ed.2d 49 (1986). Plaintiff's reliance on *Meritor Savings Bank* is misguided. In *Meritor Savings Bank,* the Supreme Court neither required that an employer have an anti-sexual harassment policy nor established any explicit standards for such policies. *See id.* at 73–75, 106 S.Ct. at 2409. Rather, it simply held, *inter alia,* that "a claim of 'hostile environment' sex discrimination is actionable under Title VII." *Id.* Nor does Title VII require defendant to maintain an anti-sexual harassment policy. Title VII guidelines only suggest that employers "should take all steps necessary to prevent sexual harassment." 29 C.F.R. § 1604.11(f) (1988). The precise nature of those steps is not mandated, although the guidelines do propose possible appropriate steps. *Id.*

14. Specifically, plaintiff claims that subsequent to the filing of this suit, GE revoked her security clearance and denied her access to classified work, allegedly in retaliation for this suit. She alleges that GE's policy did not prevent such retaliatory action. GE denies this account and suggests that such claims are more properly

raised in a separate proceeding. In any event, GE makes clear that plaintiff's security clearance is currently effective. Accordingly, without more evidence, this Court does not find sufficient basis for plaintiff's claim of retaliation.

15. Plaintiff requested specific injunctive relief apparently fashioned after that suggested in *Bundy v. Jackson,* 641 F.2d 934, 947 (D.C.Cir. 1981). However appropriate that relief may have been on the facts of *Bundy,* the facts here are different. In *Bundy,* the D.C. Circuit found injunctive relief required, even though the harassing conduct had ceased, "because [the plaintiff's] agency has taken no affirmative steps to prevent recurrence of the harassment, and because all the harassing employees still work for the agency." *Id.* at 946 n. 13. As noted earlier, *see supra* notes 4 and 9, that is not the case here. *See also Johnson v. Brock,* 810 F.2d 219, 226 (D.C.Cir.1987) (suggesting that where no specific intent to discriminate exists, it is not reasonable to conclude that future discriminatory acts are likely).

16. During the harassing incidents, plaintiff was an employee of GE's Military and Data Systems Operations (M & DSO) within its Space Systems Division. After her harassment complaints were filed with GE, she was transferred to a

cable, conciliation agreements, consent decrees, and court orders which relate to sexual harassment. There is a continuing and urgent need for managers at all levels to assure a work environment free of sexual harassment.....

M & DSO Policy, Art. I (May, 1988) (emphasis added). Article III(C) further emphasizes that "[e]ach employee will be responsible for complying with both the spirit and the letter of this Policy to achieve Operation objectives." Clearly, the policy encompasses all employees.

GE's policy also provides a specific complaint procedure that bypasses employees' immediate supervisors, if necessary. *See* M & DSO Policy, Art. III(D); *Spencer,* 697 F.Supp. at 216. Under GE's general Problem Solving Procedure, complaining employees have the option of lodging their complaints first with their Employee Relations Representative. *See* Space Systems Division Policy/Instruction 7.9 (SSD Policy), Art. II(B)(1) at 2 (Jan.1987). The M & DSO Policy also explicitly notes that Employee Relations Representatives are "charged with complaint processing and responsibility." *Id.,* Art. III(D). Significantly, Employee Relations Representatives op-

erate outside the traditional management hierarchy and, therefore, enjoy a measure of independence in their decisionmaking.[17] The policy further delegates to each GE manager the responsibility of issuing a statement explaining "the availability of complaint resolution channels and assistance with incidents of sexual harassment." M & DSO Policy, Art. III(A)(1). The confidentiality of that process is guaranteed,[18] and employees are assured that they will not be subject to reprisals if they utilize those channels.[19]

GE's policy, again contrary to plaintiff's allegation, provides for direct communication to all employees about sexual harassment matters. Since 1983, all new GE employees receive an employee handbook in which the company's policy against sexual harassment is set forth. In June, 1988, the handbook was revised to include a strong management statement against sexual harassment that also informs employees of their rights to redress.[20] That updated version was distributed immediately to all current and new employees in the Washington, D.C. area. A more comprehensive handbook incorporating the May, 1988 draft proposals is being prepared and will be distributed shortly. In the mean-

---

different office and location within M & DSO, where she is currently employed.

**17.** Donald O'Grady, the Employee Relations Manager for GE's M & DSO programs in the D.C. area, explained in his affidavit that each Employee Relations Representative "does not report to, nor is he/she evaluated by, any line manager of that facility." *See* O'Grady Aff. at 1. The purpose of having Employee Relations personnel operate outside of the management hierarchy in each facility is to ensure "they may function independently in dealing with employee problems without intervention or pressure by the managers who may be involved in the problem." *Id.* Importantly, all new employees are informed during their orientation of the role of each Representative as a "safe and independent avenue for employee complaints." *Id.* at 3.

**18.** *See* M & DSO Policy, Art. III(A)(4) ("Particular efforts would be made to conduct investigations with due regard for confidentiality to ensure protection of the complainant and the accused."); *cf.* SSD Policy, Art. II(D)(6) ("It is the responsibility of all management involved in the problem-solving process to maintain the utmost confidentiality regarding an employee's appeal.").

**19.** Mr. O'Grady averred, by affidavit, that during employee orientation programs, "it is stressed that utilization of this [complaint] procedure will be treated confidentially and will not result in any reprisals against the complaining employee." O'Grady Aff. at 2. Moreover, one of the "vugraphs" used during orientation clearly states: "You are encouraged to use the [appeals] procedure without fear of reprisal; problems can't be solved until they're identified."

**20.** The revised June, 1988 handbook contains a separate page in the beginning entitled "Organization and Policy Guide: Sexual Harassment, Statement of Policy." That statement provides in part:

It is the policy of the Military and Data Systems Operations to assure a work environment free of sexual harassment.... Sexual harassment has no place in the workplace. Ignoring the problem is tolerating the problem and Military and Data Systems Operations is determined that sexual harassment will not be tolerated.

Employee Handbook, Aerospace Business Group, Military and Data Systems Operations, Washington, D.C. Area (General Information for Newly Hired/Transferred GE Employees in the Washington Area) (Jan.1988).

time, the lead article in the company's August, 1988 newsletter to all M & DSO employees in the D.C. area highlighted the issue of sexual harassment and informed employees of the available complaint procedures.[21]

GE has also enhanced its management training. In July, 1988, GE distributed to all M & DSO managers copies of the May, 1988 draft and ordered their immediate dissemination to all employees. That same month, GE conducted four mandatory training sessions on sexual harassment issues for all managerial and supervisory M & DSO employees in this area. In October, 1988, all managers received "vugraph" materials describing sexual harassment in its various forms and outlining the proper procedures for processing complaints and investigating incidents of sexual harassment. In subsequent staff meetings, GE staff explained how managers should use them in their own staff meetings. Also in October, GE's Manager of Systems Operations for M & DSO, Wesley L. West, explained the new policy to GE's customers and other on-site contractors whose employees interact directly with GE employees.

Importantly, implementation of these policies is not left to the discretion or whim of individual managers. Rather, the policies are specific directives for action with which managers must comply. Significantly, the degree of the managers' compliance with the M & DSO Policy on Sexual Harassment is one component of their supervisors' appraisals of their work.[22]

In sum, the substantial evidence presented by GE[23] of its efforts to prevent any future illegal conduct persuades the Court that there is no "cognizable danger of recurrent violation." *United States v. W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. at 898. It is indeed lamentable that the illegal conduct occurred and was allowed to continue for a period of time. As this Court has noted previously, the GE office in which plaintiff worked "was a workplace at odds with good manners, good taste, professionalism and most importantly, Title VII." *Spencer*, 697 F.Supp. at 219. By its actions, however, GE has clearly done more than just say "we will try not to let it happen again;" they have taken concrete, effective steps designed to minimize the risk of recurrence. The vigor with which GE has pursued remedial actions convincingly demonstrates its renewed, wholehearted commitment to Title VII's strict and important requirements. On this basis, the Court concludes that injunctive relief is unnecessary.[24] Accordingly, plaintiff's motion is denied.

---

21. *See* "What is Sexual Harassment?" *Washington Focus,* vol. 1, No. 1 (Aug.1988). The article explained in some detail what the EEOC considers sexual harassment and described examples of possible harassing behavior. It then asked employees to report possible incidents of harassment immediately to "your supervisor or your Relations Representative." *Id.* at 1. The Employee Relations Manager for Washington Programs, Don O'Grady, then assured employees that

> "[f]rom that point on ... Relations will conduct a thorough and confidential investigation. If it is discovered that an employee has been victimized, appropriate action will be taken to assure that the sexual harassment has been effectively stopped.... Employees should also be assured that no retaliation action will be taken against an employee for reporting an incident of sexual harassment." *Id.*

22. *See* M & DSO Policy, Art. III(B)(5) ("Each Manager and Supervisor will be responsible for ... [i]ncluding compliance with the intent of this Policy in periodic appraisals of all managers.").

23. This summary of defendant's efforts is by no means a complete catalogue of its significant efforts to implement a more effective anti-sexual harassment policy. The Court has merely highlighted the primary areas of concern expressed by plaintiff in her request for injunctive relief.

24. Of course, future events may contradict this conclusion. Another court faced with future claims of sexual harassment against GE might well conclude that GE's policy, training and stated commitment to conform to Title VII were simply not enough and that injunctive relief is necessary.